THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

BMO Harris Bank NA,

    Plaintiff,

v.                                            Case No. 2:16-CV-00545-JPS

ELIZABETH LAILER, and

ROBERT W. BAIRD & CO.,

    Defendants.

---

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO STAY THIS ACTION AND COMPEL ARBITRATION**

---

Defendants Elizabeth Lailer and Robert W. Baird & Co. ("Baird"), by their attorneys Halling & Cayo, S.C., submit this brief in support of their motion to stay the above-captioned action and compel arbitration of the parties' dispute before an arbitration panel of the Financial Industry Regulatory Authority ("FINRA"), pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq*. The basis for this motion is that the instant dispute is governed by FINRA's arbitration rules, generally, and Rule 13200, more specifically, mandating arbitration between participants in the securities industry.

**BACKGROUND**

Plaintiff BMO Harris Bank, N.A. ("the Bank") is one of several affiliated subsidiaries through which BMO Financial Group ("BMO") provides diversified financial services in the United States. BMO offers a "combined service approach of BMO Harris Financial Advisors [("Advisors"), another subsidiary] and BMO Harris Bank, each a part of BMO Harris Financial

Group." Advisors is registered with and a member of FINRA.[1] Advisors' FINRA registration confirms that the Bank and it are organizational affiliates that share control relationships.

Ms. Lailer has worked with the Bank and Advisors from 2012 until early 2016 (and previously with the Bank's predecessor). (Lailer Dec. ¶ 2.) Throughout all events, she has held a Series 7 license overseen by FINRA and registered to Advisors. (*Id.* ¶ 4.) Advisors registered Ms. Lailer with FINRA as one of its employees throughout the employment relationship. (*Id.* ¶ 5.) Between 2012 and December 2015, Ms. Lailer held the title of Vice President – Private Banker. (*Id.* ¶ 6.) Her duties revolved around soliciting clients in connection with the Bank's and Advisors' services and products. Ms. Lailer's book of clients included those with banking, investment, and/or other financial service needs. She would select investment, trust, and banking advisors and portfolio managers to work with her and the client in the "combined approach" to meeting the client's financial and investment needs. (*Id.*) This combined approach drew no distinction for clients regarding whether they were working with Bank employees, Advisors employees, employees of another part of BMO, or a combination. The various BMO entities presented a unified or "combined" approach. (*See id.* ¶ 2.)

The instant dispute arises from the Bank's contention that on December 14, 2015, Ms. Lailer was offered a lateral transfer to a job with as "Private Wealth Advisor Director II – Grade 8." (*Id.* ¶ 8). The main change in duties was that Ms. Lailer was compelled to winnow her book of clients by transferring to others all clients who did not have investment and investment advisory needs. (*Id.* ¶ 10.) The new position was by definition focused on potential or existing investment advisory clients, *i.e.*, working with Advisors, a FINRA member. (*See id.*)

---

[1] FINRA is a industry self-regulatory organization authorized and governed by the Securities and Exchange Act. *See* 15 U.S.C.A. § 78s. (Lailer Dec. ¶ 4.)

2

The offer is variously characterized as coming from "BMO" (otherwise unspecified), BMO Financial Group, and "BMO Harris Bank N.A., part of BMO Financial Group." The Bank contends that the offer was made through a computer system that presented Ms. Lailer with a screen containing a "button" to click on to indicate acceptance. Though vague, the Bank contends that during this process, Ms. Lailer was also presented with a link and invited to click on it to review the Offer Letter's provisions. One of those purported provisions is a non-solicitation agreement on which the complaint in this action rests.

Ms. Lailer had not in fact been shown the Offer Letter or its provisions and understood that by clicking the "I accept" button, she was accepting transfer to the new position.[2] By way of background, she did not particularly want the new position (which came at no increase in compensation). Increasingly unhappy with the organization, and its treatment of employees and clients/customers alike, she felt pressured to accept the new position.

Less than a month later, on or about January 11, 2016, Ms. Lailer gave notice that she was ending her employment. (*Id*. ¶ 10.) Pursuant to a policy to which Ms. Lailer had agreed years earlier, she ceased working after giving notice but was compensated for two months during which she refrained from other employment. (*Id*. ¶ 12.) Subsequently, she was offered and accepted employment with Baird as a Vice President-Private Wealth Management. (*Id.*) Baird is also a member of FINRA.

---

[2] At no time during Ms. Lailer's employment with BMO was she presented with or did she see the purported "Offer Letter" or its claimed terms. The first time she saw it was when she was served with this lawsuit. Ms. Lailer understood only that she was being offered and pressured into accepting a lateral transfer. (Lailer Dec. ¶ 8.)

3

The Bank has now filed suit, alleging various counts concerning the non-solicitation agreement allegedly in place between Lailer and BMO, and is seeking injunctive relief and monetary damages.

**ARGUMENT**

This is a lawsuit arising out of an employment relationship largely premised on Ms. Lailer's FINRA-regulated work for and in concert with a member of FINRA. It is an "industry dispute" subject to mandatory arbitration pursuant to FINRA Rule 13200. The fact that plaintiff amended its complaint to add as a defendant Baird, a FINRA member, underscores that this dispute arises out of regulated activity among FINRA members and an associated person.

**I. REGARDLESS OF WHICH OF ITS PARTS BMO DESIGNATED AS PLAINTIFF, THIS ACTION IS SUBJECT TO MANDATORY ARBITRATION**

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., embodies "both a liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract." *AT & T Mobility LLC v. Concepcion*, 563 U.S. 339 (2011). One way the FAA advances these policies is by providing for stays of litigation in federal courts when an issue in the case is "referable to arbitration." *See* 9 U.S.C. § 3. In determining whether a matter is arbitrable:

> courts must bear in mind that 'questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.... [and] any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.' *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 941–42, 74 L.Ed.2d 765 (1983).

*Nielsen v. Piper, Jaffray & Hopwood, Inc.*, 66 F.3d 145, 148 (7th Cir. 1995).

FINRA members and "Associated Persons" have agreed to resolve disputes among and between themselves through FINRA's extensive and well-established arbitration framework. *See*

4

*Miller v. Flume*, 139 F.3d 1130, 1136 (7th Cir. 1998) (discussing FINRA's predecessor NASD); *Freund v. UBS Fin. Servs., Inc.*, 141 F. Supp. 3d 797 (N.D. Ill. 2015).

Rule 13200(a) of FINRA's arbitration rules states in relevant part:

a dispute must be arbitrated under the Code if the dispute arises out of the business activities of a member or an associated person and is between or among:

- Members;

- Members and Associated Persons; or

- Associated Persons.

The instant claims are subject to mandatory arbitration for two independent reasons. First, the Offer Letter largely concerns Ms. Lailer's work with Advisors (as a "Private Wealth Advisor Director") as part of BMO's "combined" services. Advisors, a FINRA member, held her license and registered her as its employee. This action arises from an associated person's work for a member.

Second, even if one were to ignore that she was to be doing the work of Advisors, the facts that the Bank and Advisors were under BMO's common control and they worked in a unified way, makes the Bank an "associated person" for instant purposes. BMO cannot evade the requirements of FINRA membership merely by specifying one subsidiary rather than another. One of those requirements is the mandatory arbitration of precisely the type of claim alleged.

### A. REGARDLESS OF BMO's CHOICE OF LABELS, SHE WAS DOING THE WORK OF FINRA MEMBER ADVISORS WHICH REGISTERED HER AS AN EMPLOYEE AND HELD HER LICENSE

Advisors and the Bank are mere appendages of a unified or "combined" entity, BMO. Advisors claimed Ms. Lailer as an employee in its FINRA filings and held her registration. The Offer Letter that gives rise to the dispute is styled as coming from various entities or "parts of"

5

BMO and the non-solicitation provision purports to run in favor of neither subsidiary but in favor of the parent BMO, defined as "the Company."

The new position, Private Wealth Advisor Director, was specifically focused on Advisors' work, with Ms. Lailer required to shed clients without investment and investment advisory needs. The focus of the agreement on which the complaint rests is Ms. Lailer, an associated person, doing the work of Advisors, a FINRA member. Regardless of which name BMO (which controls the other entities) opted to use to designate as plaintiff, this dispute arises out of Ms. Lailer's very brief work for Advisors, a FINRA member that held her registration and claimed her as an employee in its FINRA filings.

### B. EVEN IF BMO's CHOICE TO LABEL MS. LAILER AS A BANK EMPLOYEE WAS MEANINGFUL, THE BANK WOULD BE AN ASSOCIATED PERSON SUBJECT TO ARBITRATION

Even if the counterfactual pretense of Bank employment is given consideration, it would constitute an "associated person," again triggering mandatory arbitration. FINRA Rule 13100(r) defines association in part to include one:

> who is directly or indirectly controlling or controlled by a member, whether or not any such person is registered or exempt from registration with FINRA under the By-Laws or the Rules of FINRA.

While one reading of the definition could suggest that only a natural person can be deemed an "associated person" in this manner. The Securities Exchange Act, however, has an analogous provision that confirms that an associated person includes "any person directly or indirectly controlling, controlled by, or under common control with [a] member, or any employee of such member." 15 U.S.C. § 78c(21). The Act is clear that "person" includes not only natural persons but "compan[ies]" and other entities. 15 U.S.C. § 78c(9). The Bank and Advisors are under common control and Advisors is a member. The Bank is therefore an "associated person" for

6

mandatory arbitration purposes.  *See Essex Corp. v. Indep. Fin. Mktg. Grp., Inc.*, 994 F. Supp. 532, 535 (S.D.N.Y. 1998) (harmonizing statute with NASD rule).

BMO's structure provides an example of why in these circumstances an entity can be deemed an associated person by virtue of the manner in which they control or are controlled with or by a member has a very practical basis.  The alternative would leave some regulated activity outside the scope of regulation by having it conducted under the auspices of a non-member affiliate of a combined entity such as BMO.

*Essex*, supra, presents a scenario similar to the present one.  There, Essex, a non-member, sued former employees and their new employer for various claims similar to those in the instant matter.  While they were formally employed by Essex, their NASD licenses were maintained by the Essex's wholly owned subsidiary, which was a member.  *Id*. at 533.  The interrelation between the employee's work for Essex and the business of the subsidiary is analogous to BMO's unified "combined service approach."  There, a "hybrid" form of marketing had both entities' employees provide the services of both in a unified and interdependent fashion.  *Id*. at 537-38.  Given the common control and the interrelated work of the member and non-member, as well as that of the non-member's former employees (who had maintained their licenses with the member), the non-member was deemed an associated person subject to mandatory arbitration.  *Id*. at 535-37.  The defendants' motion to compel arbitration was granted.  *Id.* at 538.

Giving BMO the power to shield employee activities for a regulated entity by formally employing them through an affiliate would turn a blind eye to the strong policy favoring arbitration and would arbitrarily undermine aspects of FINRA's interworkings.

## II. ESTABLISHED PRINCIPLES OF CONTRACT LAW BIND TO PLAINTIFF TO ARBITRATE

Even if BMO's choice to style the employment relationship as between Ms. Lailer and the Bank were given weight, established principles of contract law would bind the Bank to the arbitration agreement created by Advisors' FINRA membership.

> there are five doctrines through which a non-signatory can be bound by arbitration agreements entered into by others: (1) assumption; (2) agency; (3) estoppel; (4) veil piercing; and (5) incorporation by reference.

*Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 687 (7th Cir. 2005); see also *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009). BMO's ownership and control over the Bank and Advisors which provide seamless, unified services, and Advisors' maintenance of Ms. Lailer's license (and FINRA registration of her as an employee) satisfy the principles of estoppel (and likely agency) such that this action is subject to mandatory arbitration.

BMO holds itself out as a provider of an array of financial services marketed in a unified fashion through employees of its different "parts," *e.g.*, the Bank and Advisors, working together without drawing any distinction for clients. Advisors holds Ms. Lailer's license and registered her as its employee with FINRA for the benefit of the Bank and BMO. Ms. Lailer was specifically compensated for generating business for Advisors. For years, Ms. Lailer did work for both the Bank and Advisors and the new job focused her substantially on Advisors with her clients limited to those with investment and investment advisory needs. Further, the asserted non-solicitation provision of the Offer Letter runs in favor of BMO not the Bank. Finally, Advisors' FINRA filings confirm direct controls relationships between it and the Bank and that the Bank and Advisors have such relationships with BMO, which may well satisfy the doctrine of agency.

8

Self-evidently, the Bank benefited from Ms. Lailer's FINRA license and her execution of the U-4, registering her with FINRA necessary to maintain the license. It is well-settled that a "nonsignatory party is estopped from avoiding arbitration if it knowingly seeks the benefits of the contract containing the arbitration clause." *Zurich American Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 687 (7th Cir.2005). "Under the doctrine of direct benefits estoppel, a non-signatory party is estopped from avoiding arbitration if she knowingly seeks the benefits of the contract containing the arbitration clause." *Everett v. Paul Davis Restoration, Inc.*, 771 F.3d 380, 383 (7th Cir. 2014). Absent the U-4 with its commitment to mandatory arbitration, Ms. Lailer would not be able to perform core functions of her job. Likewise, BMO, the Bank, and Advisors all proceeded on the basis that Ms. Lailer would maintain a FINRA license and a current U-4 for use in their businesses. She was entitled to rely on the U-4's commitment to mandatory arbitration for claims such as those raise here. And "a non-signatory party is estopped from avoiding arbitration if [it] knowingly seeks the benefits of the contract containing the arbitration clause." *Everett v. Paul Davis Restoration, Inc.,* 771 F.3d 380, 383 (7th Cir. 2014).

Here the Bank has sued to enforce a provision that benefits BMO in a contract that was premised on Ms. Lailer working with Advisors to serve clients with investments and investment advisory needs. If the mere selection of a particular plaintiff's name from a handful of available names could control whether a dispute were arbitrable, it would not only undermine the strong policy favoring alternative dispute resolution, it would inject substantial uncertainty into contractual relations. While the foregoing makes clear that this action is subject to mandatory FINRA arbitration, the "federal policy of resolving ambiguities in favor of arbitration," *Third Wave Techs., Inc. v. Mack*, No. 04-C-0079-C, 2004 WL 941205, at *3 (W.D. Wis. Apr. 28, 2004), confirms that the motion to stay and compel arbitration should be granted.

9

## CONCLUSION

Based on the foregoing, defendants respectfully request that the Court stay this action and compel arbitration of the parties' disputes before FINRA.

Dated this 21st day of June, 2016.

HALLING & CAYO, S.C.
Attorneys for Elizabeth Lailer and Robert W. Baird & Co., Defendants

By: ____/s/ Jeremy P. Levinson_____
     Michael H. Schaalman
     mhs@hallingcayo.com
     Jeremy P. Levinson
     jpl@hallingcayo.com

P.O. Address:
HALLING & CAYO, S.C.
320 East Buffalo Street
Suite 700
Milwaukee, WI 53202
414.271.3400
414.271.3841 (Fax)