# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

BMO HARRIS BANK NA,

                       Plaintiff,

v.

                                     Case No. 16-CV-545-JPS

ELIZABETH LAILER and
ROBERT W. BAIRD & CO,

                                     **ORDER**

                   Defendants.

On May 5, 2016, the plaintiff, BMO Harris Bank NA ("BMO"), filed this action alleging that the defendant, Elizabeth Lailer ("Lailer"), breached various terms of her employment contract and the Wisconsin Trade Secrets Act, Wis. Stat. § 134.90. (*See* Docket #1, #4). More specifically, BMO claims that Lailer left BMO to work for Defendant, Robert W. Baird & Co. ("Baird"), and, in so doing, breached a non-solicitation provision and a confidentiality provision contained in her former employment agreement.[1] (Docket #4 ¶¶ 26-31). BMO alleges that these breaches of contract are continuing to cause irreparable harm to BMO's reputation and business relationships within the financial wealth management industry and have caused it to suffer at least $100,000.00 in damages. (Docket #4 ¶¶ 26-31). With respect to Baird, BMO alleges both a common law aiding and abetting claim and conspiracy claim. (Docket #4 ¶¶ 41-52).

On August 31, 2016, BMO filed a motion for a preliminary injunction. (Docket #21). That motion sets forth the same core allegations as appear in the amended complaint: that Lailer, through the aid of Baird, continues to

---

[1] When referenced collectively, the Court will refer to Lailer and Baird as "the defendants."

breach the non-solicitation and confidentiality terms of her former employment contract and that such activities are irreparably harming BMO's reputation and business relationships. (*See generally* Docket #22). In light of these harms, BMO asks the Court to grant it a limited, preliminary injunction pursuant to Rule 65(b) of the Federal Rules of Civil Procedure. (Docket #21). Specifically, BMO asks this Court to enjoin Lailer, until March 10, 2017, from: (1) directly or indirectly communicating with or soliciting clients of BMO to whom Lailer provided services between March 10, 2015, and March 10, 2016; and (2) from directly or indirectly communicating with or soliciting any person they know is an employee of BMO to leave his or her employment. (Docket #21).

In addition, on September 12, 2016, BMO moved to compel the defendants to respond to their first round of discovery requests and to provide initial disclosures pursuant to Federal Rules of Civil Procedure 37(a)(3)(B) and 37(c). (Docket #25). The defendants have chosen not to provide the Court with briefing on this issue, deciding instead to file two letters[2] indicating their understanding that they have complied with all outstanding discovery requests. (Docket #27, #33). BMO has filed a reply brief, and letter, disputing this assertion. (Docket #28).

---

[2]Following BMO's submission of its reply brief (Docket #28), the defendants filed an additional letter on October 7, 2016 (Docket #33). The defendants did so without requesting, or being granted, leave from the Court to file a surreply. *See* Civ. L. R. 7(g) ("The Court may provide by order or other notice to the parties that different or additional provisions regarding motion practice apply."); *see also* Civ. L. R. 7(d) ("Failure to file a memorandum in opposition to a motion is sufficient cause for the Court to grant the motion.").

Both of BMO's motions are now fully briefed and ripe for adjudication. (Docket #22, #26, #25, #28, #29). For the reasons stated herein, the Court concludes that a preliminary injunction is appropriate in this case and will, therefore, grant BMO's motion for temporary equitable relief. (Docket #21). In addition, the Court will grant BMO's motion to compel discovery insofar as the defendants have failed to comply with their Rule 26 obligations. (Docket #25). Due to the defendants' regrettable failure to follow the local and Federal rules of civil procedure, they will be responsible for paying for the attorney's fees and costs that BMO accrued in connection with the motion to compel. Each motion will be addressed in turn.

1.    PRELIMINARY INJUNCTION

    1.1    Background

BMO is a national bank organized and existing under the banking laws of the United States with its headquarters and principal place of business at 111 West Monroe Street, Chicago, Illinois 60603. (Docket #4 ¶ 4). Lailer is a former employee of BMO and a citizen of the State of Wisconsin (Docket #4 ¶ 5); Baird is a Wisconsin corporation with its principal place of business at 777 East Wisconsin Avenue, Milwaukee, Wisconsin 53202.[3] (Docket #4 ¶ 6). Baird is in the business of providing investment advisory services. (Docket #4 ¶ 6). Effective March 10, 2016, Ms. Lailer began to work for Baird in its Waukesha office. (Docket #4 ¶ 2).

---

[3]BMO has invoked this Court's diversity jurisdiction, pursuant to 28 U.S.C. ¶ 1332(a), which the Court deems proper because the citizenship of the parties is completely diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs. (Docket #4 ¶¶ 4-7).

Prior to her transfer, Lailer was employed by BMO in its Brookfield, Wisconsin, branch. (Docket #4 ¶ 9). At least in part, her responsibilities included providing banking services to the bank's high net-worth clientele. (Docket #4 ¶ 9). On December 7, 2015, and again on December 14, 2015, BMO purportedly offered Lailer a new position as a Private Wealth Advisor Director II – Grade 8 ("Private Wealth Advisor"), with the title of Vice President of the bank. (Docket #4 ¶ 10; Docket #30 ¶ 5).

Lailer admits that she accepted a lateral transfer to the Private Wealth Advisor position. (Docket #20 ¶ 10). However, in the defendants' answer and brief in opposition to the motion for a preliminary injunction, Lailer denies that: (1) she was ever presented with the Offer Letter; and (2) she was ever otherwise made aware of the Offer Letter and its terms before accepting the transfer. (Docket #20 ¶ 1, 10; Docket #26 at 9-11). The defendants do not explain, in their answer or their brief in opposition to the motion for a preliminary injunction, the manner in which Lailer was informed, offered, and/or accepted the transfer. (Docket #20, #26).

For its part, BMO's Recruitment Channel Advisor, Sara Dassow ("Dassow"), has provided the Court with two declarations and various computer screen shots that purport to establish that: (1) Lailer was emailed the Offer Letter in question on December 7, 2015, and December 14, 2015; (2) in order to accept BMO's transfer offer, Lailer had no other option than to follow BMO's standard online offer acceptance process; (3) that part of that online acceptance process required Lailer to agree via online portal that "[b]y selecting 'Yes, I accept' [she] acknowledge[d] that [she] read th[e] offer letter and accept[ed] the offer"; (4) the Offer Letter emailed to Lailer on December 7, 2015, and December 14, 2015, respectively, also appeared in the "attachments" portion of the online acceptance portal; and (5) that an

electronic record indicated Lailer's online "acceptance" of the transfer on December 15, 2015, at 10:08 a.m. (Docket #14 ¶¶ 5-6; Docket #30 ¶¶ 4-9). In addition to clicking the "Yes, I accept" option, Dassow asserts that an employee must electronically enter his/her full name, email address, and unique employee identifier number to complete the acceptance process. (Docket #22, Ex. 1 ¶ 6).

According BMO, the Offer Letter at the heart of this dispute contained various obligations related to: (1) the non-solicitation of BMO's clients and employees; and (2) the use of confidential and trade secret information. (Docket #4 ¶¶ 12-15). The letter is marked as being sent from "Leslie Meisner, Managing Director of BMO Harris." (Docket #22, Ex. 1 at 11). It begins, by stating, "Dear Elizabeth, I am pleased to offer you a transfer to a new role with BMO Harris Bank N.A., part of BMO Financial Group (Company)." (Docket #22, Ex. 1 at 9). Among other things, the Offer Letter provided that Lailer would "protect the confidential and proprietary information of the Company, our clients, suppliers and employees." (Docket #22, Ex. 1 at 10). Were she to accept the offer described therein, Lailer would become obligated to "comply with all laws and Company policies that restrict the use, disclosure, collection and access of confidential and proprietary information." (Docket #22, Ex. 1 at 10). Finally, the Offer Letter stated: "[w]hen your employment with the Company ends, you must return all Company property, and all Company and client information, in all formats, and you must not keep any copies." (Docket #22, Ex. 1 at 10). Specific to the solicitation of BMO Harris employees and customers, the Offer Letter provided:

Case 2:16-cv-00545-JPS   Filed 10/21/16   Page 5 of 27   Document 35

During your employment and for twelve months following the
end of your employment with the Company, you must not,
directly or indirectly solicit: (i) a person who you know is an
employee of the Company to leave his or her employment; and
(ii) any client of the Company that you serviced during your
last twelve months with the Company to offer any product or
service that is the same as or similar to any product or service
that you provided to that client previously.

(Docket #22, Ex. 1 at 10).

On or about January 11, 2016, Lailer gave notice that she was quitting
her Private Wealth Advisor position at BMO.[4] (Docket #4 ¶ 17). Thereafter,
Lailer does not dispute that she began notifying various BMO clients of her
new employment. (Docket #20 ¶ 18). In one of such contacts, Lailer wrote in
an email that she was "eager to put Baird's global resources and client first
culture to work toward your goals" and that she and her assistant would
"contact you shortly about the transition process…." (Docket #4 ¶ 18).

Since beginning her employment at Baird, BMO claims that Lailer has
continued to solicit BMO's clients. (*See generally* Docket #22; *see also* Docket
#23, #24) (describing how Lailer's contact with former clients resulted in their
transferring business from BMO to Baird). Despite BMO's unsuccessful
efforts to negotiate a "stand down" with the defendants, BMO claims that
Lailer continues to misuse confidential and proprietary information. (Docket
#22 at 6). Because Lailer maintains that she was never presented with, and,
by extension, never accepted, the terms of the Offer Letter described above,
she claims that she "[i]s free [to] offer Baird's services without restriction."
(Docket #20 ¶¶ 22, 24) ("It is admitted that in working for Baird, Ms. Lailer

---

[4]The parties do not dispute that Lailer's resignation was not effective until
March 10, 2016. (Docket #20 ¶ 17). During this time she continued to accept her
salary and benefits. (Docket #20 ¶ 17).

offers the company's services a variety of potential customers and is entitled to do so without restriction. It is admitted that some of these potential customers are former or current BMO Harris customers."). BMO claims that such continuing activity is causing irreparable harm to both BMO's reputation and client relationships. (Docket #22 at 11).

### 1.2 Legal Standard

"'[A] preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it.'" *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 389 (7th Cir. 1984) (quoting *Warner Bros. Pictures, Inc. v. Gittone*, 110 F.2d 292, 293 (3d Cir. 1940) (per curiam)). "To determine whether a situation warrants such a remedy, a district court engages in an analysis that proceeds in two distinct phases: a threshold phase and a balancing phase." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1085–86 (7th Cir. 2008).

With respect to the "threshold stage," the Court must determine if the movant has met its burden to establish that: (1) "absent a preliminary injunction, it will suffer irreparable harm in the interim period prior to final resolution of its claims"; (2) "traditional legal remedies would be inadequate"; and (3) "its claim has some likelihood of succeeding on the merits." *Id.* (internal citations omitted). If the party seeking a preliminary injunction fails to satisfy its obligation to demonstrate any of these elements, the Court must not grant the injunction. *See Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992). And, only in the event "the [C]ourt finds that the moving party has passed this initial threshold, [will] it then proceed[] to the balancing phase of the analysis." *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1086.

"In this second phase, the court, in an attempt to minimize the cost of potential error, 'must somehow balance the nature and degree of the plaintiff's injury, the likelihood of prevailing at trial, the possible injury to the defendant if the injunction is granted, and the wild card that is the 'public interest.'" *Id.* (quoting *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433 (7th Cir. 1986)). "Specifically, the [C]ourt weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the [C]ourt were to grant the requested relief." *Id.* (citing *Abbott Labs.*, 971 F.2d at 11–12). "This process involves engaging in what we term the sliding scale approach; the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position." *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). "[T]his balancing process should also encompass any effects that granting or denying the preliminary injunction would have on nonparties (something courts have termed the 'public interest')." *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1086. "Taking into account all these considerations, the district court must exercise its discretion 'to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case.'" *Id.* (quoting *Lawson Prods.*, 782 F.2d at 1436).

### 1.3    Analysis

The Court will address each element of the preliminary injunction analysis in turn.

#### 1.3.1    BMO's Likelihood of Succeeding on the Merits

BMO argues that its likelihood of succeeding on the merits is particularly strong in this case given: (1) the extent of its electronic proof that Lailer both received and accepted the Offer Letter and its terms; and (2) the

reasonableness of the non-solicitation clause contained in the Offer Letter. (Docket #22 at 8-11). In response, the defendants reiterate their position that Lailer was never presented with the Offer Letter and, thus, Lailer cannot be deemed to be a "party" to any such contract, much less be held accountable for its purported breach.[5] (Docket #26 at 9-11). The Court agrees with BMO that the merits of its breach of contract claim in this case are strong and weigh in favor of granting preliminary injunctive relief.

"The elements for a breach of contract in Wisconsin are familiar; the plaintiff must show a valid contract that the defendant breached and damages flowing from that breach." *Matthews v. Wisconsin Energy Corp. Inc.*, 534 F.3d 547, 553 (7th Cir. 2008) (citing *Northwestern Motor Car, Inc. v. Pope*,

---

[5]As a threshold matter, the defendants argue that BMO lacks Article III standing to pursue its claims. (Docket #26 at 7-8). In support, they claim that the nonsolicitation clause in the Offer Letter runs in favor of BMO's parent, BMO Financial Group, instead of the bank. (Docket #26 at 7-8). The Court disagrees. "When determining standing, the emphasis is on whether the party invoking federal court jurisdiction has a personal stake in the outcome of the controversy, and whether the dispute touches upon the legal relations of the parties having adverse legal interests." *See O'Sullivan v. City of Chicago*, 396 F.3d 843, 853 (7th Cir. 2005) (internal citations omitted) (internal quotation marks omitted). Though there may be some ambiguity as to whom "the Company" refers in the Offer Letter (namely, BMO or its parent, BMO Financial Group), at this juncture, the Court is satisfied that the evidence strongly suggests that Lailer was BMO's employee during the time period in question. Lailer has submitted no evidence to dispute that: (1) prior to her transfer to Baird, Lailer was compensated by BMO (not its parent company); and (2) that the Offer Letter at the core of this dispute is one that was extended by BMO's Managing Director, Leslie Meisner. (Docket #10 ¶ 5; Docket #14 ¶ 2; Docket #30 ¶¶ 2-3; Docket #22, Ex. 1 at 11). Given these facts, the Court is satisfied that BMO has satisfied its Article III burden to allege: (1) a cognizable injury (financial and reputational); (2) that was allegedly caused by Lailer's actions when she left BMO for Baird; (3) and that this Court's intervention in the dispute would redress the harms alleged in the amended complaint.

51 Wis.2d 292, 296, 187 N.W.2d 200 (Wis. 1971)).[6] "Failure to read a contract, particularly in a commercial contract setting, is not an excuse that relieves a person from the obligations of the contract." *See Deminsky v. Arlington Plastics Mach.*, 2003 WI 15, ¶30, 259 Wis. 2d 587, 611, 657 N.W.2d 411, 423 .

Disregarding (for now) the defendants' argument that the Offer Letter's non-solicitation clause is invalid under Wisconsin law, there is no evidence before the Court to suggest that the terms embodied in BMO's Offer Letter were hidden in such a manner as to render the parties' proposed agreement unenforceable. Indeed, the defendants' only argument with respect to propriety of the contract's formation is that Lailer was never "presented" with the terms of the agreement, and, therefore, absent a meeting of the minds, the Offer Letter did not form a binding contract. (Docket #26 at 9-11).

The unrebuked facts put forth by declarations from BMO's human resources department, however, belie the defendants' argument. Indeed, the defendants have submitted no evidence to suggest that the online portal mechanism—which BMO allegedly relies upon as a standard operating procedure for employment dealings—was not used with respect to Lailer's transfer to the Private Wealth Advisor role. As Dassow explained in both her original and supplemental declarations, this online portal would have included an "attachments" page, which contained a link to the Offer Letter.

---

[6]As a federal court sitting in diversity, the Court must apply state substantive law. *See Charter Oak Fire Ins. Co. v. Hedeen & Companies*, 280 F.3d 730, 735 (7th Cir. 2002) (internal citations omitted). Here, the parties do not dispute that Wisconsin law applies; accordingly, the Court will apply Wisconsin contract law to this dispute. *See Harter v. Iowa Grain Co.*, 211 F.3d 338, 352–53 n. 12 (7th Cir. 2000) (explaining that courts forego choice of law analysis when the parties agree on the law that governs a dispute and there is a reasonable relation between the dispute and the forum whose law has been selected).

(Docket #30 ¶ 4). It is from this online portal that the employee (in this case, Lailer) must explicitly acknowledge the "offer" when clicking "Yes, I accept." (Docket #30 ¶¶ 5, 8) (explaining that an electronic timestamp of such a transaction was completed by Lailer at 10:08 a.m. on December 15, 2015).

Moreover, the defendants do not offer any evidence tending to undermine or cast doubt on the email correspondence sent by BMO's Human Resource Department to Lailer on both December 7, 2015, and December 14, 2015, in which the Offer Letter was purportedly attached. (Docket #30 ¶¶ 4, 5). Instead, the defendants' brief and answer are devoid of any explanation of how Lailer went about learning, and then ultimately accepting, her job transfer. (Docket #4 ¶ 10) (admitting that Lailer somehow "accepted" a transfer to the position). Accordingly, at this juncture, the Court finds a strong likelihood that: (1) BMO presented Lailer with the terms of the Offer Letter on at least two occasions; and (2) Lailer accepted the terms of the Offer Letter through BMO's online portal on December 15, 2015.

Secondarily, the defendants argue that even if BMO can demonstrate a likelihood that Lailer accepted the Offer Letter, the non-solicitation clause at the center of BMO's claim is unenforceable under Wisconsin law. (Docket #26 at 11-13). Again, this Court disagrees.

Under Wisconsin law, restrictive covenants in employment contracts are permitted "if the restrictions imposed are reasonably necessary for the protection of the employer or principal." WIS. STAT. § 103.465. Though they must withstand "close scrutiny," *Star Direct, Inc. v. Dal Pra*, 2009 WI 76, ¶ 19, 319 Wis. 2d 274, 287, 767 N.W.2d 898, 905, courts typically examine five factors to determine whether a restraint is reasonable: (1) whether the agreement is necessary to protect the legitimate business interests of the employer; (2) whether it is reasonable as to duration; (3) whether it is

reasonable as to geography; (4) whether it is reasonable as to the employee; and (5) whether it is reasonable as to the general public. *See Henderson v. U.S. Bank, N.A.*, 615 F. Supp. 2d 804, 811 (E.D. Wis. 2009) (collecting cases). In making this determination, courts must consider the totality of the circumstances. *See Farm Credit Servs. of N. Cent. Wis., ACA v. Wysocki*, 243 Wis.2d 305, 312, 627 N.W.2d 444 (2001).

The Court concludes that the non-solicitation cause in the Offer Letter is reasonable in light of the facts of this case. First, the evidence suggests that BMO's business—particularly that which is related to private banking and private wealth services—requires management by high-ranking, skilled employees and the development of personal client relationships. (Docket #22, Ex. 1 at 9-11; #23, #24). Thus, BMO has a legitimate business interest in protecting the customers to whom its employees provided services. *See Techworks, LLC v. Wille*, 2009 WI App 101, ¶ 9, 318 Wis. 2d 488, 503-04, 770 N.W.2d 727, 734 ("Service providers like Techworks need to ensure that there is a reasonable period during which their engineers, who develop close business relationships with the customers they service, will not work for either a competitor or a customer….").

Second, the non-solicitation clause is reasonably restricted by time. Here, not only is the non-solicitation clause retroactively limited—applying only to those customers serviced by the employee during the final twelve (12) months of his/her employment—but it is also prospectively limited—applying only to a former employee's competition for a period of twelve (12) months following his/her termination. (Docket #22, Ex. 1 at 10). Such a time duration is reasonable given the depth and sensitive nature of the relationships that financial managers develop with their clients and the

amount of knowledge/training concomitant in providing such services.[7] (Docket #23, #24); *see also Share Corp v. Momar Inc.*, No. 10-CV-109, 2011 WL 284273, at *5 (E.D. Wis. Jan. 26, 2011) (noting that "[c]ases upholding customer non-solicitation clauses have only done so when an explicit backward restriction is included"); *see also Star Direct, Inc.*, 2009 WI 76, ¶ 9 (upholding a customer non-solicitation clause that restricted the employee from contacting individuals who were customers "within a period time of one year prior to the termination of the employee's employment"); *Rollins Burdick Hunter of Wisconsin, Inc. v. Hamilton*, 101 Wis. 2d 460, 462-63, 304 N.W.2d 752, 753-54 (1981) (upholding a restrictive covenant that prohibited

---

[7] The defendants argue that the non-solicitation clause is unreasonable because it "reaches back" to clients that Lailer serviced prior to her employment as a Private Wealth Manger. (Docket #26 at 13). And, the defendants suggest that, even if the clause is enforceable, the non-compete provision should operate from the date Lailer submitted her resignation, January 11, 2016, rather than her effective termination date, March 10, 2016. (Docket #26 at 14). Both of these arguments are unavailing. First, the language of the non-solicitation provision is unambiguous and sufficiently limited in time to only those clients Lailer personally served within the twelve (12) months prior her to termination. (Docket #22, Ex. 1 at 10). Because the Offer Letter's language is unambiguous on its face—and absent any showing that the defendants' business would be unreasonably burdened if the language were enforced as written—the Court is obliged to enforce the provision according to its terms. *See Wysocki*, 243 Wis.2d 305, ¶ 11, 627 N.W.2d 44 ( "[W]e cannot allow the underlying policy of Wis. Stat. § 103.465 and our rules of construction to overwhelm the focus of our analysis in what are, at their core, contract cases."). Second, in their answer, the defendants do not dispute that Lailer continued being paid by BMO for sixty (60) days following her January 11, 2016, resignation. (Docket #20 ¶ 17). Thus, the defendant's argument stands at odds with the basic factual reality that Lailer remained on BMO's payroll, as an employee, until March 10, 2016. (*See also* Docket #22 at 10) (showing that the Offer Letter provided that "[y]ou will remain an employee of the Company, even where, in its discretion, it does not require you to work during the sixty (60) days"). The Court will accordingly: (1) honor the plain language of the non-solicitation clause; and (2) treat the non-solicitation clause's effective date as March 10, 2016. *See Star Direct, Inc.*, 2009 WI 76, ¶ 62.

an employee from contacting clients who were customers for the previous two years); *see also Turnell v. CentiMark Corp.*, 796 F.3d 656, 664 (7th Cir. 2015) (noting that the non-compete "covenants are incident to an employment relationship, and two years post-employment is a reasonable duration").

Next, the Court agrees with BMO that the lack of a geographic limitation in the non-solicitation clause does not render it per se invalid. *See Rollins Burdick*, 101 Wis.2d at 465, 304 N.W.2d at 755 ("In a proper case the preferability of a restraint expressed in terms of particular customers or particular activities over one expressed in geographic terms is evident."). Here, because the customers that Lailer serviced in the Brookfield, Wisconsin, branch over the twelve (12) months prior to her leaving BMO were predominately local, the Court concludes that the restraint expressed in terms of particular customers was likely just as, if not more, narrowly tailored as a general geographic restriction. *Id.* ("The limitation expressed in terms of particular clients or customers more closely approximates the area of the employer's vulnerability to unfair competition by a former employee and does not deprive the employee of legitimate competitive opportunities to which he is entitled."); *Cf. Outsource Int'l, Inc. v. Barton*, 192 F.3d 662, 670 (7th Cir.1999) (Posner, J., dissenting) (noting that a non-compete in an employment contract is unlikely to impair the vitality of competition).

Finally, the clause is both reasonable as to Lailer and reasonable as to the public. Though Lailer claims to be a fledgling employee at a new company, as a highly skilled professional, it is difficult to believe that Lailer would not have understood that some form of non-compete clause would have affected her direct and targeted solicitation of former clients. Moreover, while it is true that the public is generally served by the mobility of workers, the enforcement of unambiguous contracts, negotiated at arms length, is

equally a matter of public concern. Thus, the totality of the circumstances lead this Court to conclude that the non-solicitation clause embodied in the Offer Letter is both reasonable and enforceable.

In sum, therefore, the Court concludes that the likelihood of BMO's success on prevailing on its breach of contract claim is high.[8] BMO has demonstrated a strong likelihood of it being able to establish that Lailer accepted the terms of the Offer Letter, which includes a reasonable non-solicitation clause, and that Lailer's admitted contact and solicitation of former BMO clients within twelve (12) months of her effective termination (March 10, 2016) constitute a material breach of the agreement. Accordingly, this factor weighs in favor of the granting of a preliminary injunction.[9]

---

[8]BMO does not present arguments with respect to the merits of its trade secrets claim. (*See generally* Docket #22). The defendants have not objected to this. (Docket #26).

[9]The Court notes that the defendants have not argued that BMO's non-solicitation clause should not be enforced with respect to the clause's application to former employees. (Docket #26); (*see also* Docket #22, Ex. 1 at 10) ("During your employment and for twelve months following the end of your employment with the Company, you must not, directly or indirectly solicit: (i) a person who you know is an employee of the Company to leave his or her employment…."). Nor does BMO focus on this portion of the non-solicitation clause in its briefs, other than to note that in Lailer's email to BMO clients, Lailer references that Rachel (her assistant) also transferred to Baird. (Docket #22 at 5; Docket #22, Ex. 1 at 13). The amended complaint also alleges that "Lailer solicited her assistant, Rachel Hodorff, to quit…for Baird, also in violation of the terms of the Offer Letter." (Docket #4 ¶ 9). As neither of the parties have presented the Court with arguments as to whether the Court can/should treat this portion of the non-compete provision differently, the Court will refrain from ruling on such an issue. *See United States v. Viren*, 828 F.3d 535, 539n. 2 (7th Cir. 2016) (arguments not raised are waived).

### 1.3.2 BMO's Irreparable Harm & The Adequacy of a Legal Remedy[10]

"The irreparable harm requirement helps the courts weigh the costs of denying a preliminary injunction to a plaintiff who goes on to win on the merits against the costs of granting the injunction to one who goes on to lose." *Bedrossian v. Nw. Mem'l Hosp.*, 409 F.3d 840, 845 (7th Cir. 2005). In this case, the Court must bear in mind that "[w]henever an employee uses his experience gained from an employer in violation of a reasonable covenant not to compete, irreparable injury occurs and injunctive relief is appropriate." *JAK Prods., Inc. v. Wiza*, 986 F.2d 1080, 1084 (7th Cir. 1993) (interpreting Indiana law).

Here, BMO argues that Lailer's violation of the Offer Letter's non-solicitation clause is causing it to suffer irreparable reputational harm and is damaging (if not fully destroying) its business and client relationships. (Docket #22 at 11; Docket #23; Docket #24). The defendants argue that BMO's delay in filing for a preliminary injunction—and its claim for money damages—undermine any argument that a purely legal remedy would be inadequate to compensate BMO's alleged losses. The Court, however, agrees with BMO that the evidence in this case supports the conclusion that Lailer's seemingly unfettered solicitation of former BMO customers will effect immeasurable and irreparable harm to the bank's goodwill and the integrity

---

[10]Though the "irreparable harm" and "adequacy of a legal remedy" elements are distinct components of the preliminary injunction calculus, they are related. *See Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) ("The requirement of irreparable harm is needed to take care of the case where although the ultimate relief that the plaintiff is seeking is equitable, implying that he has no adequate remedy at law, he can easily wait till the end of trial to get that relief."); *Abbott Laboratories*, 971 F.2d at 11. For this reason, the Court will analyze these prongs of the preliminary injunction test together.

of its client relationships. Accordingly, these factors weigh in favor of an injunction.

Based on the nature of BMO's financial management services, the Court is satisfied that the company's reputation is a critical component of its business relationships. Indeed, as the defendants admit, Lailer's role as a private wealth advisor required her to understand and work with entrusted personal and business information related to BMO Harris's high net-worth clientele. (Docket #20 ¶ 1). According to BMO's Vice President and Regional Sales Manager, Steven Gorzek, Private Wealth Advisors such as Lailer serve as liaisons between BMO and high-net worth clients who often leverage other departments within BMO's broader corporate structure, including the business banking group. (Docket #23 ¶¶ 1-3). Based on BMO's interrelated service offerings, and the particular role of the wealth advisor within this operation, it is reasonable to conclude that the goodwill developed between Private Wealth Advisors and clients is one that runs to the company more broadly. *See Gateway Eastern Ry. Co. v. Terminal R.R. Ass'n*, 35 F.3d 1134, 1140 (7th Cir.1994) ("We have stated that showing injury to goodwill can constitute irreparable harm that is not compensable by an award of money damages."); (*see also* Docket #24 ¶ 2) (explaining that—according to BMO's Senior Business Banker and Relationship Manager, Michael Goedheer—the type of clientele at issue in this case are "individuals [that] often require sophisticated personal banking and financial services beyond that of a typical customer").

The continuing and comparative nature of Lailer's client communications also support the Court's conclusion that her solicitations of former BMO customers will irreparably harm the bank's reputation in the industry. (*See, e.g.*, Docket #22, Ex. 2). Here, BMO has provided the Court

with declarations from two of BMO's financial services employees that attest to their having experienced damaged, if not totally destroyed, client relationships from Lailer's contacts and meetings with BMO clients. (Docket #23, #24). In addition, BMO has provided an example of one of Lailer's written solicitations. (Docket #22, Ex. 2). That email confirms that Lailer is representing to BMO clients that,

> [i]n selecting the right firm to support our important relationship, Rachel [a former BMO employee] and I spoke with representatives from some of the largest and most reputable names in the industry. Ultimately, our research led us to Baird.…[w]e're eager to put Baird's global resources and client-first culture to work toward your goals. We will contact you shortly about the transition process.…

(Docket #22, Ex. 2).

The natural import of Lailer's email is that her expertise and "research" have led her to conclude that Baird is a superior financial services provider compared to her former employer. Based on this implied comparison, there is little doubt that Lailer's communications have the likely potential of undermining BMO's market position. *See Triumph Packaging Group v. Ward*, 834 F.Supp.2d 796, 816 (N.D. Ill. 2011) (noting that in the context of a non-compete clause, solicitation of direct competitors is strong evidence of irreparable harm). Indeed, based on the defendants' answer and the declarations submitted by BMO's employees, the Court is satisfied that Lailer's continued violation of the non-compete clause renders this case a particularly strong candidate for injunctive relief. *Turnell.*, 796 F.3d at 664 ("The potential damage to [the employer to whom a non-compete clause runs]… is a canonical form of irreparable harm. The injuries that flow from the violation of a non-compete are difficult to prove and quantify…That is what makes restrictive covenants prime candidates for injunctive relief.").

Finally, the Court concludes that, on the basis of Lailer's conduct, money damages would not adequately repair BMO's harm. On the one hand, money damages are particularly difficult to calculate in a case such as this where reputational harm is at stake. *See Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003) ("Because it is not practicable to calculate damages to remedy this kind of harm, no remedy at law can adequately compensate Foodcomm for its injury."). Moreover, a money damage award following the conclusion of the litigation may come at a time when BMO is unable to repair its tarnished image and customer relationships within the banking industry. *See Roland Machinery*, 749 F.2d at 386 (explaining that a finding of an inadequate remedy at law may follow where a "damage award may come too late to save the plaintiff's business" or "[t]he nature of the plaintiff's loss may make damages very difficult to calculate").

Though the defendants make much of the fact that BMO did not file its motion for a preliminary injunction until August 31, 2016, they fail to recognize that the defendants had not filed their answer to the complaint until August 24, 2016. (*See* Docket #20 (filed August 24, 2016)). Thus, it was only one week after receiving the defendants' initial pleading that BMO filed its motion for equitable relief. (*Compare* Docket #20 (filed August 24, 2016) *with* Docket #21 (filed August 31, 2016)). Moreover, BMO represents that prior to filing of this motion it was actively negotiating a "stand down" with the defendants. (Docket #29 at 5). It was only after BMO determined that its out-of-court efforts were failing to resolve this matter that it filed for relief. (Docket #29 at 10). Therefore, without any showing of whether/how BMO's purported delay affected Lailer's or Baird's business dealings, the Court cannot fairly conclude that any delay between the filing of BMO's claims and the instant motion should affect the outcome of the Court's analysis. *See N.*

*Star Indus., Inc. v. Douglas Dynamics LLC*, 848 F. Supp. 2d 934, 950 (E.D. Wis. 2012) ("[M]ere evidence of delay without any explanation on [Defendants'] part of why such a delay negatively affected [them], would not lessen [Plaintiff's] claim of irreparable injury."); *see also In re Aimster Copyright Litig.*, 252 F. Supp. 2d 634, 662 (N.D. Ill. 2002), *aff'd*, 334 F.3d 643 (7th Cir. 2003) (holding that a 16- to 17-month delay seeking preliminary injunction did not undermine presumption of irreparable harm; reiterating that, "in assessing the excusability of delay in seeking a preliminary injunction, the relevant issue is whether a defendant has been 'lulled into a false sense of security or had acted in reliance on the plaintiff's delay'") (citing *Ty, Inc.*, 237 F.3d at 903).

For these reasons, the Court concludes that BMO is suffering irreparable harm for which an inadequate remedy at law exists. Thus, these factors weigh in favor of granting BMO a preliminary injunction

### 1.3.3  The Balancing of Harms

Having satisfied the threshold test for a preliminary injunction, the Court must "consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied." *Ty, Inc.*, 237 F.3d at 895. Here, the Court concludes that the "balance of harms" weighs in favor of BMO.

On the one hand, the defendants urge the Court to find that the balance of hardships weigh in their favor because Lailer is in a stage of "transition" in her career and "Baird continues to invest in and support a new employee." (Docket #26 at 15-16). According to the defendants, the disruption that an injunction would cause, in combination with the public's interest in a restraint-free and open marketplace, counsels against the entry

of an injunction. (Docket #26 at 15-16). On the other hand, BMO argues that an injunction will "fundamentally protect" its reputation and impose a minimal burden on the defendants (because the non-solicitation clause will only be in effect until March 10, 2017). (Docket #22 at 11-12). BMO also points out that a preliminary injunction enforcing the clause will not cause any material harm to the defendants because they can continue to solicit clients for Baird—just not those former BMO clients who Lailer served for twelve (12) months prior to her departure. (Docket# 22 at 11-12).

The Court agrees that the balance of harms favors BMO. First, the limited nature of the non-solicitation provision in Lailer's contract ensures that Lailer is still able to make a living, and that Baird is able to continue servicing customers in the financial management industry. Second, the potential harm on the defendants if the non-solicitation clause is enforced is minimal in comparison to the potential reputational harm that BMO would suffer if Lailer were able to continue unfettered solicitation of BMO's clients. Moreover, while the public certainly has an interest in an open marketplace and employee mobility, it is equally true that the public is served by the Court's enforcement of arms-length transactions and unambiguous contract terms. Thus, the Court concludes that the balance of harms favors BMO.

### 1.4    Conclusion

In determining whether to grant injunctive relief, the district court must take into account all four the factors outlined above and then "exercise its discretion 'to arrive at a decision based on the subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case.'" *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1086 (quoting *Lawson Products, Inc.*, 782 F.2d at 143). Given the strong likelihood that BMO will prevail on its breach of contract claim, the Court concludes that a

preliminary injunction enforcing the Offer Letter's non-solicitation clause is appropriate. The Court will, therefore, grant BMO's motion for a preliminary injunction. (Docket #21).

2.      MOTION TO COMPEL DISCOVERY

Next, pursuant to Federal Rules of Civil Procedure 37(a)(3)(B) and 37(c), BMO asks this Court to enter an order compelling the defendants to: (1) comply with their Rule 26(a) initial disclosure obligations; and (2) properly respond to BMO's first set of requests for production and interrogatories, consistent with Rules 33 and 34. (Docket #25). Though the defendants claim, via two letters to this Court, that they have satisfied their discovery obligations (Docket #27, #33), BMO claims that the defendants' belated disclosure and discovery responses still fail to supply adequate information under the Federal Rules of Civil Procedure. (Docket #28, #34). Because this Court agrees—and in light of the defendants' noncompliant and obstructionist conduct—the Court will grant BMO's request and award BMO its attorney's fees and costs associated with the discovery motion.

District courts have broad discretion in discovery matters. *See Kalis v. Colgate–Palmolive Co.*, 231 F.3d 1049, 1056 (7th Cir. 2000). In relevant part, Rule 26(a) states that:

> a party must, without awaiting a discovery request, provide to the other parties:
>
> (i) the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment;

(ii) a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment; [and]

…

(iv) for inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.

(Fed. R. Civ. P. 26(a)(1)(A)).

Though, in general, Rule 26(a) disclosures are due within fourteen (14) days of the parties' Rule 26(f) conference, here, the parties agreed to exchange information fourteen (14) days following this Court's decision on the defendants' motion to compel arbitration. (Docket #12 at 1) ("The parties do not propose any changes to the disclosures under required by Fed. R. Civ. P. 26(a), which the parties agree to make within two weeks of the Court's decision on the pending Motion to Stay Action and Compel Arbitration, if that motion is denied."); *see also* Fed. R. Civ. P. 26(c). As the Court entered an Order denying the motion to compel arbitration on August 2, 2016 (Docket #19), initial disclosures were due on August 16, 2016. Notwithstanding their agreement, the plaintiff agreed to an extended disclosure deadline of September 2, 2016, on the basis of defense counsel's promise that there would be a "shake up" of "command and control" of the case. (Docket #25 ¶ 3). Ultimately, the defendants waited until October 3, 2016—the same day they responded to BMO's motion to compel—to provide their disclosures. (Docket #28, Ex. 1).

However, as BMO highlights in its reply brief, the defendants' one-page initial disclosure utterly fails to comply with both the letter and spirit

of Rule 26. The only person the defendants name as "likely" possessing "discoverable information" is Lailer herself. (Docket #28, Ex. 1). In addition, instead of providing copies and/or descriptions of documents, electronically stored information, and/or tangible things that the defendants may use to support their claims and defenses, the defendants merely state that "[t]he gathering and review process that will permit production of documents within the scope of [Rule 26] is nearly complete and production is anticipated in the immediate future." (Docket #28, Ex. 1). Lastly, the defendants claim that Rule 26(a)(1)(A)(iii) and (iv) are inapplicable. (Docket #28, Ex.1).

The Court finds the defendants' half-hearted efforts to comply with Rule 26 wholly unacceptable. While the notion that only one person—the individually named defendant herself—might have discoverable information under Rule 26(a)(1)(A)(I) is all but unbelievable, the defendants' plain failure to even attempt to comply with Rule 26(a)(1)(A)(ii) is undisputable. The defendants have twice failed to meet the initial disclosure deadlines that they voluntarily and expressly set for themselves and for BMO. Federal courts "ha[ve] no patience for obstructionist tactics." *Ricoh Co., Ltd. v. Asustek Computer, Inc.*, 2007 WL 5414809, Case No. 06-CV-462, *2 (E.D. Wis. Jan. 4, 2007). Thus, this Court concludes that the defendants have failed to comply with both the substance and time constraints mandated by Rule 26. Therefore, the defendants will be ordered to produce compliant information within seven (7) days of the entry of this Order.

Second, with respect to the defendants' obligations to respond to BMO's request for production and interrogatories, the Court notes that during the parties' July 14, 2016 scheduling conference, the Court explicitly indicated that the parties were free to initiate discovery. (Docket #16). Accordingly, on July 20, 2016, BMO claims that it served both requests for

production and interrogatories on both of the defendants. (Docket #25 ¶ 2). Responses to these requests were, therefore, due on August 22, 2016. *See* Fed. R. Civ. P. 6(d), 33(b)(2), 34(b)(2). Nonetheless, the defendants failed to comply with the deadline. (Docket #25 ¶ 2). Instead, on August 30, 2016, defense counsel wrote to BMO's counsel, stating that it expected "to make a rolling production to you beginning on September 6, 2016" and that "[w]ritten responses to the discovery will follow next week." (Docket #25 ¶ 4). Nonetheless, no rolling production or written responses to discovery requests followed. (Docket #25 ¶ 4).

In the defendants' second letter to this Court—which was filed on October 7, 2016, without leave and/or permission—they claim to have produced all outstanding documents and interrogatories. (Docket #33). Though BMO acknowledged that this matter had been fully briefed prior to the defendants' second letter, it has elected to file a responsive letter which indicates that the defendants' production, though forty-five days late, occurred and, moreover, is deficient in material respects. (Docket #24).

Without having the benefit of defendants' discovery responses in the record before it, the Court cannot fairly determine whether the defendants' belated production substantively satisfies their discovery obligations. Nonetheless, the Court has no qualms concluding that the defendants' briefing on this motion and production of discovery has ignored the requirements of the federal rules, at least procedurally. *See* Fed. R. Civ. P. 6(d), 33(b)(2), 34(b)(2); *see also* Civ. L. R. 7(g) ("The *Court* may provide by order or other notice to the parties that different or additional provisions regarding motion practice apply."); *see also* Civ. L. R. 7(d) ("Failure to file a memorandum in opposition to a motion is sufficient cause for the Court to grant the motion."). As with their initial disclosures, the defendants appear

to have initiated a pattern of disingenuous behavior, reflective of a cavalier attitude toward both the federal and local rules. As recently reiterated by District Judge Haywood Gilliam,

> the discovery system depends absolutely on good faith and common sense from counsel. The courts, sorely pressed by demands to try cases promptly and to rule thoughtfully on potentially case dispositive motions, simply do not have the resources to police closely the operation of the discovery process. The whole system of Civil adjudication would be ground to a virtual halt if the courts were forced to intervene in even a modest percentage of discovery transactions. That fact should impose on counsel an acute sense of responsibility about how they handle discovery matters. They should strive to be cooperative, practical and sensible, and should turn to the courts (or take positions that force others to turn to the courts) only in extraordinary situations that implicate truly significant interests.

*Loop Al Labs Inc., v. Gatti*, 2016 WL 1273914, Case No. 15-CV-798, *1 (N.D. Cal. Feb. 5, 2016) (quoting *In re Convergent Techs. Sec. Litig.*,108 F.R.D. 328, 331 (N.D. Cal. 1985)).

In light of the practices described above, the Court will exercise its discretion under Rule 37(a) and (c) to grant BMO's motion to compel the defendants to: (1) produce *complete* initial disclosures, consistent with Rule 26(a)(1); and (2) ensure their compliance with BMO's first request for production and interrogatories, consistent with Rule 33 and 34. (Docket #25). Likewise, the Court will order the defendants to pay BMO's attorney's fees and costs associated with the filing of this motion to compel. *See* Fed. R. Civ. P. 37(a)(5)(a), (d)(A)(ii). Though the Court will leave the amount of this sanction to be resolved among the parties, the defendants are reminded that, if they "fail[] to provide information or identify a witness as required by Rule 26(a) or (e), the[y] [will] not [be] allowed to use that information or witness

to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c).

3.     CONCLUSION

Based on the determinations made herein, the Court concludes that BMO is entitled to a preliminary injunction—until March 10, 2017—whereby Lailer will be prohibited from: (1) directly or indirectly communicating with or soliciting clients of BMO to whom Lailer provided services between March 10, 2015, and March 10, 2016; and (2) directly or indirectly communicating with or soliciting any person they know is an employee of BMO to leave his or her employment. (Docket #21). In addition, the Court will grant BMO's motion to compel the defendants to: (1) produce compliant Rule 26 initial disclosures; and (2) ensure that they have properly responded to BMO's first request for production and interrogatories. (Docket #25). As outlined above, the parties shall be responsible for negotiating an appropriate monetary sanction in the form of attorney's fees and costs associated with BMO's motion to compel. (Docket #21).

Accordingly,

IT IS ORDERED that BMO's motion for a preliminary injunction (Docket #21) be and the same is hereby GRANTED; and

IT IS FURTHER ORDERED that BMO's motion to compel discovery and for sanctions (Docket #25) be and the same is hereby GRANTED.

Dated at Milwaukee, Wisconsin, this 21st day of October, 2016.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge